AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

### for the

#### Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
fourteen electronic storage devices seized at the )
residence at 969 Market St, #2002, San Diego, California )
on August 5, 2020 )

Case No.  '22  MJ4575  BGS

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 371/1341/1343/1344 | Conspiracy/Mail Fraud/Wire Fraud/Bank Fraud |
| 26 USC 7206(1) | Failure to File a Tax Return |
| 26 USC 7206(2) | Assisting in the Preparation of a False Tax Return |

The application is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Erik La Com*
*Applicant's  signature*

Erik La Com, Special Agent, U.S. Secret Service
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means).*

Date:  ___12/16/2022___

*Judge's signature*

City and state: San Diego, California

Hon. Bernard G. Skomal, US Magistrate Judge
*Printed name and title*

<u>ATTACHMENT A</u>

The items to be searched are fourteen (14) electronic storage devices (the **TARGET DEVICES**) seized during the search of the residence of Alvin Pates on August 5, 2020, pursuant to a federal search warrant issued by Magistrate Judge Butcher and filed as 20-mj-3179.  The **TARGET DEVICES** are more particularly described as:

a.      Apple iPad model A1416, inventoried during the search as item 1 on evidence form 412-2020-CE-465;

b.      1-G hard disk drive, inventoried during the search as item 2 on evidence form 412-2020-CE-46;5

c.      Apple iPad model A1475, inventoried during the search as item 3 on evidence form 412-2020-CE-465;

d.      Apple iPad model A1416, inventoried during the search as item 4 on evidence form 412-2020-CE-465;

e.      WOR(L)D Space MCELL5G, inventoried during the search as item 3 on evidence form 412-2020-CE-466;

f.      Buffalo, Inc. hard disk drive, inventoried during the search as item 2 on evidence form 412-2020-CE-467;

g.      Buffalo, Inc. hard disk drive, inventoried during the search as item 2 on 412-2020-CE-469;

h.      Seagate Technology Inc., LRDOTU3 hard disk drive, inventoried during the search as item 1 on evidence form 412-2020-CE-471;

i.      Seagate Technology Inc., LRDOTU3 hard disk drive, inventoried during the search as item 2 on evidence form 412-2020-CE-471;

j.      Apple iPhone model A1662, inventoried during the search as item 1 on evidence form 412-2020-CE-477;

k.      Apple iPad model A2069, inventoried during the search as item 2 on evidence form 412-2020-CE-482;

l.      Apple iPhone 11 Pro Max, inventoried during the search as item 4 on evidence form 412-2020-CE-482;

m.      Apple MacBook Pro model A1707, inventoried during the search as item 1 on evidence form 412-2020-CE-487; and

n.      Apple iPad Pro model A1652, inventoried during the search as item 1 on evidence form 412-2020-CE-495.


The **TARGET DEVICES** are currently in the possession of the U.S. Secret Service, at the San Diego Field Office located at 550 West C Street, Suite 660, in San Diego, California.

ATTACHMENT B

The evidence to be searched for and seized concerns violations of Title 18, United States Code, Section 371 (Conspiracy to Defraud and to Commit Offenses); Title 18, United States Code, Section 1341 (Mail Fraud); Title 18, United States Code, Section 1343 (Wire Fraud); Title 18, United States Code, Section 1344 (Bank Fraud); Title 26, United States Code, Section 7206(1) (Failure to File Tax Return); and Title 26, United States Code, Section 7206(2) (Aiding or Assisting in the Preparation of False Returns), for the period from January 1, 2014, up to and including August 5, 2020, and is described as follows:

a.      Electronic records, mail, messages, images, and data on the **TARGET DEVICES**, limited to:

(1)    **Tax Returns, Tax Documents, and Publications**: Federal and State of California tax returns (including all related schedules, forms, worksheets, and attachments for all tax returns for individuals, corporations, S corporations, partnerships, trust and estates) employment tax returns, information returns, tax documents and publications.  These documents include (a) U.S. Individual Income Tax Returns (Forms 1040, 1040A, 1040EZ, 1040X), (b) U.S. Corporation Income Tax Forms (Form 1120 or 1120-S); (c) U.S. 501(c)(3) Tax Forms (Forms 990-N, 990, 990-EZ), (d) Forms W-2, (e) Forms 1099, (f) California Resident Income Tax Returns (Forms 540, 540A, 540 2EZ, 540NR) (g) correspondence and communications with any tax professional, and (h) correspondence and communications with the Internal Revenue Service and the California Franchise Tax Board;

(2)     **Tax Software and Services:** Records related to tax preparation software and services, including but not limited to Tax Hawk and Turbo Tax (Intuit);

(3)     **Accounting and Other Internal Financial Records:** Accounting records, including income statements, balance sheets, inventory records, payment schedules, general ledgers, subsidiary ledgers, ledgers of cash receipts and disbursements, sales journals, purchase journals, vendor or customer lists, payroll journals, accounts payable, accounts receivable, accounting software records (such a Quicken, QuickBooks, or Peachtree), and other spreadsheets, summaries, and compilations of accounting and financial information;

(4)     **Banking and Financial Institutions Records**: Records related to banking or finances, including bank or financial accounts at domestic or foreign banks, savings and loans, credit unions, securities brokers, or other financial institutions.  These documents or records include bank statements, loan applications, canceled checks, check registers, deposit or withdrawal records, documents related to the origin of all deposited funds, money orders, cashier's checks, bank checks, receipts, confirmation slips, credit card statements and documents related to wire transfers.

(5)     **Income and Expenses**: records related to income received by Alvin PATES or expenses (such as purchases and spending), including invoices and receipts).

(6)     **Corporate Records:** records relating to the operations and management of any corporation or identifying business relationships between PATES (a.k.a. ALVIN NOBLE) and any business entity, including One World Alliance, One Word Alliance, One World Alliance Group, Bel Cante and Bel Cante 2011.   These record include operating agreements,

incorporation records, membership agreements, ownership divisions, contracts, Board minutes, business licenses, bylaws, load documents, lease records, powers of attorney, insurance records and financing statements.

(7) **Communications and Correspondence:** records of communications to, from or including PATES about/concerning any of the items in categories 1-6, above, and any correspondence with victims or co-conspirators, including emails, letters, memos, faxes, notes, records of telephone calls, and messages.

The seizure and search of the **TARGET DEVICES** shall follow the procedures outlined in the supporting affidavit. Deleted data, remnant data, slack space, and temporary and permanent files on the digital devices may be searched for the evidence above.

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Erik La Com, Special Agent, U.S. Secret Service ("USSS"), being duly sworn, hereby depose and state:

## I.   INTRODUCTION

1.     I make this affidavit in support of an application for issuance of a search warrant, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, for fourteen (14) electronic storage devices seized during the execution of a search warrant (20mj3192) at the residence of Alvin Pates at 969 Market St., Unit 2002, San Diego, California, 92101 (hereinafter the "**TARGET DEVICES**"), more fully described in Attachment A, which is incorporated herein by reference.

2.     The purpose of the search warrant is to seize evidence of federal crimes, including: Conspiracy to Defraud and to Commit Offenses (18 U.S.C. § 371), Mail Fraud (18 U.S.C. § 1341), Wire Fraud (18 U.S.C. §1343), Bank Fraud (18 U.S.C. §1344), Failure to File Tax Return (26 U.S.C. §7206(1)), and Aiding or Assisting in the Preparation of False Returns (26 U.S.C. §7206(2)), for the period from January 1, 2014, up to and including August 5, 2020, as more fully described in Attachment B.

3.     My knowledge of the facts alleged in this affidavit arises from my training, experience, personal observations, my review of records and documents obtained during this investigation, witness interviews, reports written by me and other agents, and discussions with other law enforcement agents involved in the investigation, including agents with the United States Secret Service, the Internal Revenue Service (IRS) and the Federal Bureau Investigation.  I am familiar with the facts set forth below based upon my own investigative findings and conversation with other participating law enforcement agents. Since the purpose of this affidavit is limited to establishing a foundation for the requested warrant, I have not included every fact I know about this investigation. Dates and dollar amounts are exact or best approximations.

4.     I am a Special Agent (SA) with the United States Secret Service (USSS), San Diego Field Office, and have been so employed since June 2010.   I am a federal law

enforcement officer for the United States within the meaning of Section 3056 of Title 18, United States Code, in that I am empowered by law to conduct investigations, apply for search warrants, and to make arrests for federal felony offenses. I am also assigned to the SoCal Cyber Fraud Task Force (SoCal CFTF).

5. The SoCal CFTF is a task force sponsored by the United States Secret Service that is comprised of State, Local, and Federal Law Enforcement Agents. As a SA and member of the SoCal CFTF, my duties are to investigate violations of federal and state law, including financial crimes and related activity in connection with the fraudulent use of access devices, credit card skimming/re-encoding, identity theft, wire fraud, mail fraud, check fraud, bank fraud, and the manufacturing of counterfeit currency/commercial securities, and the use of complex schemes to conceal and launder the proceeds of such crimes. I have assisted in and/or personally prepared and executed numerous search and arrest warrants for investigations involving such crimes. I have investigated over 150 cases involving identity theft, the use of stolen and/or manufactured counterfeit (CFT) or forged checks, and cases involving the manufacture or use of stolen or fraudulent personal identification cards, bank bust-outs, account takeovers, and non-sufficient funds (NSF) checks, cases involved with skimming credit cards and debit cards, fraudulent debit and credit card investigations, parasitic devices designed to capture credit card data, point of sale terminals designed to transact credit card transactions, cases involving cryptocurrency, and the manufacturing of counterfeit United States currency. I have also received training through a Basic Investigation of Computers & Electronic Crimes Program (BICEP), I am familiar with the criminal elements and schemes commonly employed by persons who commit these types of violations. I am also familiar with the use of computers and specialized electronics to commit these crimes, and I have arrested suspects who have utilized computers and specialized electronics to commit fraud, identity theft, credit and debit card fraud, and the manufacturing of counterfeit United States currency.

6. I received approximately 80 hours of training in the manufacturing techniques used for genuine Federal Reserve Notes. This training consisted of lectures and practical

exercises covering the production of genuine U.S. currency, to include the papermaking process, allowing for the detection of counterfeit Federal Reserve Notes. As part of the training, I have been to the U.S. Bureau of Engraving and Printing in Washington, D.C. where I learned about and observed the printing of genuine currency. I have testified as a genuine U.S. currency expert in State and Federal court.

7.   I am a digital forensic examiner for the USSS, a member of the Electronic Crimes Special Agent Program (ECSAP). My training includes Basic and Advanced Computer Evidence Recovery Training, (BCERT – 240 hours of training/ACERT – 80 hours of training), Mobile Device Forensic course (MDE – 40 hours of training), Critical Systems Protection Basic Lead Advanced Course (CSP – 40 hours of training), and Skimmer Forensics Course (40 hours of training). Additionally, I complete 32 hours of continuing education in computer forensic related training annually to learn about current developments in the field of computer forensics. My training includes, but is not limited to, recovering evidence of hacking, network intrusion, data compromise, etc., the capture and analysis a forensic image of a hard disk drive, acquiring random access memory (RAM) for analysis, the capture and analysis of a cellphone, skimmers, vehicle infotainment systems or other mobile device storage for analysis, maintaining the integrity of computer forensic analysis and evidence, and verifying the integrity of computer systems which might affect the safety and security of a U.S. Secret Service protectee. I have testified as a computer expert witness in State and Federal court.

8.   I received and completed formal training that included an eleven (11) week Criminal Investigations Training Program at the Federal Law Enforcement Training Center in Glynco, GA, as well as an additional seventeen (17) week SA training program at the USSS James J. Rowley Training Center in Beltsville, MD. I have received over 200 hours of specialized training in fraud, forgery, counterfeit detection, and identity theft.

9.   Since being assigned to the San Diego Field Office as a SA, I have had the opportunity to be attached to the SoCal CFTF and gain experience in investigating and effecting arrests for a wide variety of criminal investigations such as organized crime, street

*Affidavit in Support of Search Warrant*

gangs, money laundering, racketeering, conspiracy, extortion, homicide, robbery, illegal gambling, and firearms trafficking. I have personally interviewed and debriefed financial crimes suspects and gang members and discussed their various methods of operation, and have participated in numerous undercover ("UC") and covert operations targeting these criminal groups. During the course of these task force investigations, I also gained experience in Title III wiretaps and analyzing jail house telephone calls placed by persons in custody. Because of this experience I have become familiar with the methods employed by criminals to thwart the detection of law enforcement through numerous avenues of technology.

10.     Prior to serving as a Special Agent with the United States Secret Service, I graduated from the United States Military Academy at West Point with a Bachelor of Science degree in Systems Engineering. After graduation I was commissioned as an officer in the United States Army, and served as a Captain in the United States Army as an attack helicopter pilot, Attack Platoon Leader, Headquarters and Headquarters Company Executive Officer, and Battalion Logistics Officer. I served in these capacities from Fort Hood, Texas, Camp Page, Korea, and a deployment to Iraq in support of Operation Iraqi Freedom.

## II.   PROBABLE CAUSE OF CRIMINAL ACTIVITY

### A.   Overview

11.     This investigation involves two categories of fraudulent conduct by Alvin PATES (a.k.a. Al Noble): tax fraud and financial institution fraud. First, as detailed in greater length below, in approximately April 2016, Pates was involved in the preparation of false tax returns for at least three individuals – Melgar Tamayo, Aaron White and David Moseid – in order to fraudulently generate over $1.1 million in improper federal tax refunds from the IRS. In exchange, PATES was paid a fee of $8,250 from each taxpayer and received or expected to receive a percentage of the illegally gained refunds.

12.     Second, beginning at least as early as January 2014, PATES perpetuated a financial institution fraud scheme by recruiting straw borrowers including White, Tamayo

and others, many of whom he met through church, to defraud financial institutions through fraudulent loan and credit card applications. Specifically, as detailed in greater length below, PATES recruited straw borrowers to obtain loans and/or lines of credit from various banks and credit unions using fraudulent information, promising the borrowers that he would pay the loans. PATES failed to fully repay the loans and credit cards as promised, leaving the borrowers in debt when the loans or lines of credit in their names went into default and causing significant losses to the banks.

B.   **Evidence of Tax Fraud Scheme**

13.   I have probable cause to believe that PATES aided and assisted in the preparation of false tax returns for at least three taxpayers –Melgar Tamayo, Aaron White and David Moseid – based on a review of tax returns and bank records by the IRS, and interviews with associates of PATES, including Tamayo, White, and David and Brenda Moseid, as detailed below.

*__Melgar Tamayo__*

14.   IRS agents interviewed Melgar Tamayo on October 11, 2018, and October 29, 2019.   During the course of those interviews, Tamayo provided the following information:

a.   Tamayo met PATES in 1999 through the San Diego Church of Christ. Tamayo moved out of his family's house and moved in with PATES to his home in Vista shortly after he met PATES. He lived with him for about six months until PATES got married.

b.   Tamayo met PATES again in 2015 when they ran into each other at a Starbucks. PATES recruited Tamayo to come work for him at his "business."

c.   As detailed below, Tamayo obtained multiple bank loans for PATES using Tamayo's personal identifying information ("PII"), which Tamayo provided to PATES for this purpose.

d.      In 2016, PATES told Tamayo that the federal government owed Tamayo money based on the promissory note[1] for the house in which Tamayo resided. Because Tamayo trusted PATES, he paid PATES $8,250 to prepare his 2015 Form 1040. Tamayo said he transferred $8,250 into a Bank of America account as directed by PATES[2] as a fee for his tax preparation.

e.      Tamayo met PATES at a Fed Ex location to sign the Forms 1040 that PATES prepared for him. Tamayo's tax return documents included his Form W-2 from Costco, where Tamayo was employed.  It also included reference to the principal home loan for his parents' home from Pacific Marine Credit Union ("PMCU"), and a $72,000 bank loan from Navy Federal Credit Union ("NFCU") (each discussed more below).

f.      Tamayo received a tax refund check from the IRS, but before he cashed the check, he was contacted by federal law enforcement and, as described herein, began cooperating with law enforcement.

15.    IRS agents reviewed the account transcript and tax return with attachments for Tamayo for tax year 2015 that were submitted to the IRS, and have confirmed the following:

a.      A Form 1040 tax return was filed on July 18, 2016.

b.      It listed total income of $594,796.

c.      It claimed a refund of $376,260.

d.      Supporting the Form 1040 was a 2015 Form W-2 reflecting wages of $49,882.62 from Costco Wholesale Corporation.

e.      In addition, there were two 2015 Forms 1099-MISC filed with the Form 1040.[3] One was for PMCU and claimed $454,151 in federal income tax withholdings. The other was for NFCU and claimed $84,311 in federal income tax withholdings.

---

[1]      The residence is owned by Tamayo's parents.
[2]      As described below, the account was held in the name of Bel Cante 2011, not in the name of Alvin Pates.
[3]      A Form 1099-Misc details miscellaneous income being paid to a person during the year.

*Affidavit in Support of Search Warrant*

6

f.    The tax return purported to be self-prepared by Tamayo.

g.    On August 2, 2017, the IRS issued a refund check for $395,942.20.[4]

h.    On October 13, 2017, Tamayo returned the check to the IRS.

i.    In November of 2017, Tamayo filed an amended return that claimed total income of $58,713 and a refund due of $2,840.  On January 4, 2018, the IRS issued a refund to Tamayo of $3,023.81, which included interest of $183.81.

16.    IRS agents reviewed documents received from PMCU and NFCU and confirmed that neither entity issued the Forms 1099 that were submitted to the IRS with Tamayo's tax return. Therefore, I have probable cause to believe that the Form 1099s were fraudulent. Based on Tamayo's statements that PATES said he would prepare his tax return and later handed the tax return and supporting documents to Tamayo, I have probable cause to believe that PATES prepared or caused the preparation of the fraudulent Forms 1099-MISC. Based on the appearance and format of the Form 1099s, I believe them to have been created electronically.

17.    IRS agents reviewed financial records from various institutions, including multiple Bank of America accounts in the name of Bel Cante 2011,[5] and attempted to corroborate Tamayo's statements regarding paying PATES for preparing his tax return. Based on those records, I determined the following:

a.    On March 21, 2016, Tamayo transferred $8,250 into a Bank of America account in the name of "Bel Cante 2011 dba Brenda Moseid" ending in -8640. [6]

---

[4]    It is unknown why it took over a year for the IRS to issue a refund check. The refund check amount included interest of $19,682.20.

[5]    Based on interviews with witnesses, some of which are described in greater detail below, I have probable cause to believe that Bel Cante 2011 is one of the many entities associated with PATES.

[6]    Although Brenda Moseid's name appears as the DBA, the only signatory on the Bel Cante 2011 account -8640 was Melgar Tamayo. As detailed below, Brenda Moseid was another one of PATES' straw borrowers.

b.      On March 28, 2016, there was a wire transfer of $8,000 from the Bel Cante 2011 account -8640 into a JP Morgan Chase account in the name of "Kaye Holdings Trust."[7]

18.      On July 24, 2020, a grand jury in the Southern District of California returned a sealed indictment charging PATES with a single count of Aiding and Assisting the Preparation of a False Tax Return in violation of 26 U.S.C. §7206(2), related to the preparation of Tamayo's false 2015 tax return, which further reflects a finding of probable cause to believe that PATES committed this criminal tax offense.

### *Aaron White*

19.      I interviewed Aaron White on October 23, 2017, in the presence of White's then-attorney. White provided the following information during his interview:

a.      White knew PATES by the name of "Alvin Noble" and met him in November 2015 through Oceanside Calvary Church. White noticed that PATES "wore nice clothes and drove fancy cars." As they got to know each other over time through the food ministry at the church, PATES solicited White to work for him.

b.      PATES told White that he could improve White's credit so that White could get approved for loans to help support PATES's business. As detailed below, White took out a loan for PATES and PATES also used White's PII to obtain credit cards.

c.      Meanwhile, PATES also told White that he knew how to prepare taxes. White felt like PATES was very knowledgeable with tax laws based on their discussions.

d.      At PATES' request, White gave PATES his and his wife's Forms W-2 and related tax preparation information. White had a home mortgage loan that was originally through Caliber Home Loans and then re-financed in March 2015 with Specialized Loan Servicing LLC. PATES directed White to call both home mortgage companies and have them send White the promissory notes for those mortgages. PATES told White that with the promissory notes, he had a fiduciary responsibility to claim the

---

[7]      Agents are in the process of obtaining additional bank records to continue to trace the transactions and identify the owners of the Kaye Holdings Trust.

*Affidavit in Support of Search Warrant*

8

money from the promissory notes. PATES explained to White that White had authority for a fiduciary relationship based on his financial and ownership interest in the assets or income in a Real Estate Mortgage Investment Conduit ("REMIC") for U.S. federal tax purposes.

   e.  On April 18, 2016, White and Melgar Tamayo,[8] another person White knew through the church food ministry, met PATES at the IRS office in San Marcos, CA. PATES gave White completed Forms 56 to take into the IRS office.[9] PATES did not go into the IRS office with him. White had the forms reviewed and stamped by the IRS. Afterwards, White and Tamayo went with PATES to a Starbucks in Oceanside, CA where PATES put together each of their tax returns.[10] White did not review the tax return (Form 1040) with PATES, but he did sign the document. According to White, PATES put his and Tamayo's documents into separate certified mail envelopes and gave the envelope to them. White and PATES then went to the post office on Oceanside Blvd. and mailed the envelopes with the Forms 1040 to the IRS.

   f.  As part of the tax return prepared by PATES, PATES had White claim federal tax withholdings on a Form 1099-MISC, Miscellaneous Income: $576,741 from Caliber Home Loans and $541,389 from Specialized Loan Servicing, LLC. With these claims, White received a federal income tax refund of $749,423 and a state refund of

---

[8] White reportedly believed (incorrectly or mistakenly) that Tamayo's name was Mel Nogard.

[9] The Form 56 is a notice concerning fiduciary relationship.  It is used to provide notification to the IRS of the creation or termination of a fiduciary relationship. A fiduciary is any person or position of confidence acting on behalf of any other person. The fiduciary assumes the powers, rights, duties, and privileges of the person or entity on whose behalf he or she is acting.  The Forms 56 used in this case gave Tamayo and White powers and rights over the mortgage loans.  The form basically stated that Tamayo and White were named a trustee under a valid instrument.

[10] Reports of Tamayo and White's statements differ slightly regarding some of these details, e.g. White recalled signing the 1040 with Tamayo at a Starbucks. It is unclear at this time which of the witnesses' memories is correct in this regard, but their statements are generally consistent as to all the significant facts.

$120,706. White trusted that PATES knew tax law, and therefore believed everything was legitimate.

g.      In March 2016, White paid PATES $8,250 to prepare White's 2015 Form 1040. In August 2016, after receiving the refund, White paid PATES $54,578.31 for PATES' share in getting White the large refund.[11]

20.    IRS agents reviewed the account transcript and tax return with attachments for Aaron White for tax year 2015, and have confirmed the following:

a.      A Form 1040 tax return was filed on July 18, 2016.

b.      It listed income of $56,746 and other income of $1,146,382.

c.      It claimed a refund of $749,423.

d.      Supporting the 1040 were Forms W-2 reflecting wages from In-N-Out Burger in the amounts of $13,819.98 for Aaron White and $42,925.86 for White's wife, Jenny White.

e.      In addition, there were two 1099-MISC filed with the Form 1040. One was for Specialized Loan Servicing, LLC and claimed other income of $541,389. The other was for Caliber Home Loans and claimed other income of $576,741.

f.      The tax return purported to be self-prepared.

g.      On November 8, 2016, the IRS issued White a refund check for $765,899.55.

21.    IRS agents have reviewed documents received from Specialized Loan Servicing, LLC and Caliber Home Loans and confirmed that the Whites did in fact have a home mortgage with Caliber Home Loans from January 2015 until April 2015.  The loan was then transferred to Specialized Loan Servicing.  However, neither entity issued the Form 1099s that were submitted to the IRS with White's tax return. Based on White's statements that PATES said he would prepare his tax return and later handed the tax return

---

[11]    White was unwilling to provide more information about what happened to the remaining portion – hundreds of thousands of dollars – of the tax refund.

*Affidavit in Support of Search Warrant*

1  and supporting documents to White, I have probable cause to believe that PATES prepared
2  or caused the preparation of the fraudulent Forms 1099-MISC.

3         22.    IRS agents reviewed financial records from various institutions, including
4  from White's E-Trade account ending in -0585, and attempted to corroborate White's
5  statements regarding paying PATES. Based on those records, the IRS agents determined
6  the following:

7                a.     On January 25, 2016, there was a $21,100 wire from White's E-Trade
8  account to a BofA Bel Cante 2011 account ending -0978.

9                b.     On March 17, 2016, there was an $8,250 wire from White's E-Trade
10 account to a BofA Bel Cante 2011 account ending -8640.

11               c.     On August 17, 2016, White wired $54,578.31 from his E-Trade account
12 to a Bel Cante 2011 account ending -2701 held at JP Morgan Chase Bank.

13               d.     On November 25, 2016, White wired $40,000 to the BofA Bel Cante
14 2011 account ending -0978.

15               e.     Once these payments were deposited into these accounts, they were
16 transferred many times through several accounts. Many of the payments went into a Kaye
17 Holdings Trust account held at JP Morgan Chase and a Copilot Ventures Fund II account
18 held at Branch Banking and Trust (BB&T).

19               f.     IRS agents have requested a copy of the refund check to determine into
20 what account White deposited the IRS refund check.

21         ***David Moseid***

22         23.    IRS agents interviewed David and Brenda Moseid on December 10, 2019,
23 and Brenda Moseid was later interviewed telephonically on August 29, 2017, by Secret
24 Service Special Agent Lucas Winn. During the course of those interviews, the Moseids
25 provided the following information:

26               a.     In 2015, Brenda Moseid's brother, Greg Strange, told them about
27 something that he and they characterized as a "network marketing program," which was

28

*Affidavit in Support of Search Warrant*

supposed to be an investment opportunity that was led by "Al Noble."[12] PATES contacted the Moseids and initially they declined to participate in the "network marketing program." However, about a year later, PATES called them again and they began doing business with him. PATES came to the Moseids' home and set up business paperwork.

b.      PATES nominally designated Mr. Moseid as Business Manager of the company, "One World," and applied for several loans using both Mr. and Mrs. Moseid's names.

c.      In 2016, PATES told Mr. Moseid that he could prepare his taxes and obtain him a refund. Mr. Moseid trusted PATES and paid PATES $8,250 to prepare his 2015 Form 1040.

d.      In early 2016, Mr. Moseid met PATES at the IRS office in San Marcos. PATES gave Mr. Moseid forms to take into the IRS to have an IRS employee sign. These forms included Forms 56 and Forms 1099 related to his mortgage. An employee for IRS stamped the forms. PATES waited on Mr. Moseid to come back out from the IRS office. The Moseid's accountant had originally prepared their tax returns, noting the Moseid's filing status as "Married Filing Separately." Mr. Moseid told the accountant to only prepare his tax return, not file it. Mr. Moseid gave the completed tax returns to PATES. PATES told them they would get over $600,000 in tax refunds. They did not receive the money.

e.      Mr. Moseid said he attempted to file the return at the IRS office in Laguna Niguel, California, but it was rejected.

---

[12]      People who met PATES through San Diego Church of Christ knew him by his true name. According to his estranged wife, Sandra Pates, he stopped going to the Church of Christ – where the two of them had met and married – in approximately 2010 when he had a falling out (followed by a lawsuit) with one or more fellow congregants. He later started attending Calvary, where he got involved in the "In His Name" food ministry. PATES started using the last name "Al Noble" at Calvary; as such, people who met him through that church mostly know him as Al Noble.

24. IRS agents have reviewed the unfiled tax return with attachments for David Moseid for tax year 2015, which Mr. Moseid provided to the agents. The documents confirm the following:

a. The unfiled Form 1040 tax return, signed by the Moseids on May 4, 2016, listed total income of $1,035,616.

b. It claimed a refund of $661,622.

c. In addition, there were two Forms 1099-MISC filed with the Form 1040. One was for Wells Fargo Bank and claimed $430,809 in federal income tax withholdings. The other was for 1st National Bank and claimed $580,294 in federal income tax withholdings.

d. The return purported to be self-prepared.

25. IRS agents confirmed that no 1099 was sent to the IRS by Wells Fargo Bank or First National Bank (the entities that allegedly issued the Forms 1099 that David Moseid attempted to submit to the IRS with his tax return). Based on Mr. Moseid's statements that PATES said he would prepare his tax return and later handed the tax return and supporting documents to Moseid, I have probable cause to believe that PATES prepared or caused the preparation of the fraudulent Forms 1099-MISC.  Again, based on the appearance and format of those records, they appear to have been created electronically.

26. Based on the above information, I have probable cause to believe that in 2016, PATES aided and assisted in the preparation of false claims for federal income tax refunds for tax year 2015 for White, Tamayo and Moseid in an effort to defraud the United States. I have further probable cause to believe that PATES caused the false returns for White and Tamayo to be filed with the IRS, claiming refunds of $1,125,683. I have further probable cause to believe that PATES attempted to cause Moseid's fraudulent return to be filed with the IRS, claiming a refund of $661,622. I further have probable cause to believe that PATES knew at the time that White, Tamayo and Moseid had not received the "Other income" reported on the returns and the Forms 1099, and therefore knew that they were not entitled to the significant refunds claimed in their respective returns.

*Affidavit in Support of Search Warrant*

13

**C.**    <u>**Evidence of Financial Institution Fraud Scheme**</u>

27.     I have probable cause to believe that PATES defrauded numerous financial institutions by recruiting straw borrowers to obtain fraudulent loans and lines of credit based on interviews of approximately a dozen of his victim borrowers and review of bank and financial institution records. Although I have probable cause to believe PATES' bank fraud is vast and began as early as 2014, this affidavit will focus on a limited portion of the evidence gathered to date for purposes of establishing probable cause.

*__Melgar Tamayo__*

28.     As indicated above, IRS agents interviewed Melgar Tamayo on October 11, 2018, and October 29, 2019. Tamayo was also interviewed by USSS Special Agent Lucas Winn on October 17, 2017, and October 19, 2018. During the course of those interviews, Tamayo provided the following information:

     a.     Soon after the Starbucks meeting described above, PATES took Tamayo to many different banks to open bank accounts and apply for loans for PATES' businesses. Usually, PATES would have Tamayo sign as "President" or "Vice President" on the various bank accounts.

     b.     Tamayo recalled obtaining loans from Navy Federal Credit Union (he believed it was for approximately $72,000) and Pacific Coastal (he believed it was for approximately $60,000-$70,000.) He also recalled opening bank accounts at Chase Bank, US Bank and Bank of America. He further recalled receiving at least one credit card from National Bank. Some of the corporate names Tamayo recalled being used on the accounts were Green Oaks and One World.

     c.     Tamayo opened one account at Chase Bank by himself with a document PATES provided for him to give to the banks. The document had information such as the business name and address and how much he earned with the company.[13] PATES was present when Tamayo opened the other Chase accounts.

---

[13]     This information was false; Tamayo reported that he did not actually make an income from or serve in any officer positions with PATES' companies.

d.      After opening the accounts, Tamayo gave full access to PATES. PATES accessed the accounts electronically after Tamayo opened the accounts. PATES then provided Tamayo with the online sign-on credentials and pin number for the debit cards associated with the accounts. Tamayo recalled the pin number PATES told him to use for the one of the debit cards as 7040; he recalled it was set as 7040 because it was close to the type of BMW Pates drove (a 740 series.) PATES deposited funds into the accounts that were opened using Tamayo's name. Thereafter, PATES instructed Tamayo to transfer money to different accounts or withdraw money from the accounts for PATES. Tamayo remembered transferring money into PATES' Bel Cante-Bank of America account at PATES' instruction.

e.      Tamayo indicated that he did not get to keep any of the loan or credit card proceeds, although PATES did allow him to sometimes use the cards to get a drink at Starbucks after he made a transfer at the bank.

f.      Tamayo indicated that he has received numerous contacts from the financial institutions and/or their collections agencies attempting to collect on the loans and credit cards. In his October 29, 2019, meeting with agents, he showed them documents reflecting recent collections activity on the loans he fraudulently obtained for PATES.

29.    A financial analysis by a Secret Service Supervisory Investigative Analyst reveals that between approximately April and May 2015, Tamayo obtained over $200,000 dollars in loans:

| Date | Financial Institution | Loan Amount |
|------|----------------------|-------------|
| 5/6/15 | Pentagon Federal Credit Union | $25,000 |
| 5/7/15 | NASA Federal Credit Union | $30,000 |
| 6/2/15 | SDCCU | $10,000 |
| 7/6/15 | Navy Federal Credit Union | $69,349 |
| 8/3/15 | Navy Federal Credit Union | $72,000 |
| | **Total** | **$206,349** |

//
//
//

*Affidavit in Support of Search Warrant*

30.     The analysis also identified at least five credit cards issued to Tamayo:

| Date | Financial Institution | Line of credit |
|---|---|---|
| 5/20/15 | JP Morgan Chase | $8,500 |
| 5/20/15 | Pacific Marine Federal Credit Union | $30,000 |
| 9/4/15 | Pentagon Federal Credit Union | $5,000 |
| 2/9/16 | Bank of America | $8,000 |
| 3/24/17 | Navy Federal Credit Union | $25,000 |
| | **Total** | **$76,500** |

31.     Analysts traced some of the money from the fraudulently obtained loans. For example, according to bank records, on May 7, 2015, Tamayo opened an account with NASA Federal Credit Union and obtained a signature loan for $30,000. The signature loan falsely represented that Tamayo made $8,250/month at Costco. The loan (403853-21) was funded with a Cashier's Check made payable to "Melgar Tamayo," which was deposited on May 18, 2015, into a Pacific Marine Credit Union account (2048368-9) in the name of One World Enterprises/Melgar Valdez Tamayo.[14] In the months that followed this deposit, there were numerous wires, cash withdrawals, and checks debited from the account. By August 2016, the account balance was $11.74.

32.     The loan from NASA FCU was in collection status at least as early as March 24, 2017, with an outstanding balance owed of $1,279.68. The credit union charged off[15] the account in approximately September 2017 with a balance of $5,118.72.

### *Aaron White*

33.     IRS agents interviewed Aaron White on October 23, 2017, in the presence of White's attorney. Special Agent Winn also interviewed White with his attorney on October 27, 2017. White provided the following information during his interviews:

        a.     He knew PATES as Al Noble and met him while volunteering at the

---

[14]     Tamayo is the only signatory on the PMCU account; he is listed as Treasurer and President of One World Enterprises Group, Inc. As part of the documentation provided to the credit union to open the account, PATES is reported as the Vice President and Secretary of One World Enterprises Group, Inc.

[15]     "Charge off" is a banking term that appears in the financial institution records to reflect that the institution is considering the unpaid balance as uncollectible and reportable as a loss.

*Affidavit in Support of Search Warrant*

16

1    food ministry at Oceanside Calvary Church.

2          b.      PATES told White that his background was in banking and real estate;
3    he claimed to be involved in numerous charities (mostly for children), domestic and
4    international, and would donate money to their cause.

5          c.      Approximately 2 to 3 weeks after meeting White, PATES told him he
6    had a lot of people on his team that worked for him, and a lot of them were from the church.
7    PATES offered to provide White the opportunity to earn some money, repair his credit,
8    fund his organizations, and donate to the charities.

9          d.      White agreed, and provided PATES with his personal identifying
10   information, including his social security number and date of birth. PATES wrote all of
11   White's information down on 6 to 8 forms he brought to the post office; White believes he
12   may have signed one or two of the forms. PATES also took White's fingerprint.

13         e.      PATES told White that he and his team were going to apply for loans.
14   White said he did not personally apply for any of the loans in question. Once the loans
15   were approved, PATES gave White 10% of the loan and claimed he was giving the rest to
16   charities.

17         f.      PATES said he would make the loan payments for White and provide
18   pay stubs for the corporation he was supposedly working for, One World Alliance.

19         g.      White said that everyone PATES was working with had different titles
20   in the company. He believed his title was Secretary.

21         h.      Pentagon Federal Credit Union (PenFed) was the first loan that was
22   approved in White's name; the loan amount was $25,000. The money was sent to White's
23   residence via a check, then he wired the money to PATES through his E-Trade account to
24   PATES' "Bel Cante 2011" account with US Bank. White then received a $2,500 payment
25   from PATES.

26         i.      After the PenFed loan, PATES told White that he ran into
27   complications and said he could no longer pay on the loan. After PATES said he could no
28   longer pay the PenFed account, White took over the account and continued payments on

17

*Affidavit in Support of Search Warrant*

his own.[16]

j.    Pates told him not to discuss their business with anybody else and that it was exclusively between them.

34.    A financial analysis revealed that White obtained at least five loans for PATES, including over $100,000 in December 2015 alone:

| Date | Financial Institution | Loan Amount |
|---|---|---|
| 12/4/15 | Pentagon Fed Credit Union | $25,000 |
| 12/11/15 | NASA FCU | $30,000 |
| 12/23/15 | California Coast CU | $20,000 |
| 12/23/15 | Navy Federal Credit Union | $34,000 |
| 4/10/17 | Navy Federal Credit Union | $15,000 |
| | Total | **$124,000** |

35.    I have probable cause to believe that the loan applications contained false information. For example, according to bank records, on December 11, 2015, White opened an account with NASA Federal Credit Union (Member # 422791) and applied for a signature loan in the amount of $30,000.00. The loan application falsely represented that White had been a "Managing Director" at One World Alliance for four years, earning $8,500 per month. The loan (422791-21) was funded with a Cashier's Check issued on December 15, 2015, made payable to "Aaron White" for $30,000.00. On December 29, 2015, a Security & Fraud Prevention Manager at NASA FCU contacted White about a "discrepancy" regarding his claimed employment at One World Alliance. On March 31, 2016, a stop payment was ordered on a $30,000.00 check (#1628843). After multiple messages back-and-forth between NASA FCU and White, White eventually returned the $30,000 cashier's check on November 30, 2016.

### *David Moseid*

36.    IRS agents interviewed David and Brenda Moseid on December 10, 2019; Brenda Moseid was also interviewed telephonically on August 29, 2017, by Secret Service

---

[16]    A PenFed investigator confirmed that White did in fact pay off the balance (close to $18,000) on October 13, 2017.

Special Agent Lucas Winn about the same matter.  During the course of those interviews, the Moseids provided the following information:

> a.      The Moseids met PATES in Fall 2015, and also knew him as "Al Noble." They met PATES (aka Noble) through Brenda's brother, Greg Strange. Strange told his sister and brother-in-law that PATES had investment opportunities for them.

> b.      The Moseids provided their PII to PATES to obtain business loans. Brenda took out approximately 10 loans for PATES totaling $120,000; David took out approximately 7-9 loans totaling $220,000.

> c.      David also opened several corporate credit cards for PATES.

> d.      Some of the loans they applied for over the telephone and/or over the internet, and in those an associate of PATES' (a woman who they believed lived on the East Coast) assisted them. David Moseid also traveled personally to some of the local banks to obtain the loans; when he did, PATES was with him.

> e.      In exchange for obtaining the loans, the Moseids were paid 10% of the proceeds. Brenda believed PATES paid her $12,000; David believed he received about $22,000.

> f.      PATES paid the loans for approximately six months, but then stopped making payments on them. The Moseids tried to make the payments on the loans for about three or four months, but the loans all went into default.

> g.      The Moseids have faced several collection actions and severely damaged credit.

37.     I have probable cause to believe that the Moseids' loan applications contained false information relating to their employment. For example, on a loan application that Brenda submitted to Mission Federal Credit Union, she claimed that she was employed at Bel Cante as a "Finance Manager" earning $7,900 per month. Similarly, on a loan application submitted to California Coast Credit Union, David claimed to be a "Regional Manager" at One World Center, receiving a salary of $7,500 per month. David said he provided that false information on the loan application "per [PATES'] instruction."

*Affidavit in Support of Search Warrant*

1
2

38.    A financial analysis identified five loans that David Moseid obtained for PATES:

| Date | Financial Institution | Loan Amount |
|---|---|---|
| 10/19/15 | Pen Fed Credit Union | $20,000 |
| 10/22/15 | NASA FCU | $30,000 |
| 10/20/15 | California Coast CU | $20,000 |
| 10/20/15 | Navy Federal Credit Union | $45,000 |
| 11/4/15 | Pacific Marine Credit Union | $20,000 |
|  | Total | **$135,000** |

39.    In addition, the analysis identified two credit cards that David Moseid obtained for PATES:

| Date | Financial Institution | Line of Credit |
|---|---|---|
| 5/8/16 | JP Morgan Chase | $4,000 |
| 11/14/16 | Navy Federal Credit Union | $25,000 |
|  | Total | **$29,000** |

40.    A financial analysis identified three loans that Brenda Moseid obtained for PATES:

| Date | Financial Institution | Loan Amount |
|---|---|---|
| 12/15/15 | Golden 1 Credit Union | $10,000 |
| 12/4/15 | California Coast CU | $12,000 |
| 11/30/15 | Navy Federal Credit Union | $45,000 |
|  | Total | **$67,000** |

41.    A financial analyst attempted to trace the funds from the loans. According to bank records, on December 4, 2015, Brenda opened an account with California Coast Credit Union (Member # 975149), applied for and received a signature loan in the amount of $12,000. The loan (975149-80) was funded by means of a cashier's check payable to Brenda Moseid and deposited into her personal checking account (975149-01) on December 14, 2015. That same day, however, a check was written out of the personal checking account for $12,000 and deposited into a BofA account (-8640) in the name of "Bel Cante 2011 DBA Brenda Moseid." After the deposit into BofA account -8640, the funds were transferred to different BofA account in the name Bel Cante 2011 (-0978) and

then transferred again to yet another BofA Bel Cante 2011 account (-0965).[17] After the funds were transferred into the BofA account (-0965), several payments were made to other credit unions (likely to pay down other loans) and numerous transactions that appear personal in nature such as Trader Joe's, Costco, Starbucks, Teri Café, etc., as well as cash withdrawals.

**D.    Evidence of Failure to File Tax Returns**

42.    IRS agents reviewed records from the IRS, including account transcripts, and saw no evidence that PATES has ever filed a U.S. individual income tax return.

43.    On January 22, 2020, IRS agents participated in an interview of PATES' wife, Sandra Pates ("Sandra.") Sandra was still married to PATES at the time, but has been separated since approximately December 2019. Sandra said that her husband never filed tax returns while they were married, and she did not file any tax returns while she was a stay-at-home mom.  When she began working outside of the home again in approximately 2014, she began to file her own separate tax returns (married filing separately) because her husband continued to refuse to file taxes. She said that he claimed that paying taxes was voluntary and optional.

44.    Based on interviews of witnesses and reviewing numerous bank records, I have probable cause to believe that PATES received income that should have been reported in one or more tax years on a tax return. For example:

a.    As described above, PATES received income from the fraudulent tax preparation scheme.  Specifically, as described by Tamayo, White and David Moseid – and at least partially corroborated by bank records – PATES received $8,250 each for tax preparation services in 2016, for a total of $24,750.

b.    As described above, White paid him an additional $54,578.31 in August 2016, from his fraudulently obtained tax refund.

---

[17]    The signatories on the BofA Bel Cante 2011 accounts were as follows: (1) for -8640, Melgar Tamayo, (2) for -0965, Melgar Tamayo, (3) -0978, Melgar Tamayo and Charles Nguyen.

*Affidavit in Support of Search Warrant*

**III.**   **PROBABLE CAUSE FOR LOCATIONS TO BE SEARCHED AND ITEMS TO BE SEIZED**

**A.**   **Basis For Items To Be Seized**

45.    As further outlined below, I have probable cause to believe that the items described in Attachment B will constitute fruits, evidence and instrumentalities of a crime based on the following:

a.    **Tax Returns, Tax Documents, and Publications**: Tax returns and related documents and records (such as Forms 1099, W-2s, etc.) will provide evidence of whether PATES was involved in the preparation of the fraudulent returns for Tamayo, White, Moseid and/or others not yet known, as well as evidence of his own tax evasion or failure to file tax returns, while tax publications will provide information about PATES' knowledge of accounting rules;

b.    **Tax Software and Services:** Records related to tax preparation software will similarly evidence PATES' involvement in tax preparation of the fraudulent returns as well as his general knowledge of tax preparation;

c.    **Accounting and Other Internal Financial Records:** Accounting records or any other type of personal or business financial records that PATES has kept will be critical for understanding what business, if any, PATES has been legitimately engaged in or using as shell entities to conceal and further his involvement in fraudulent schemes, any profit received from his alleged businesses or fraudulent schemes, and evidence of PATES' evasion;

d.    **Banking and Financial Institutions Records**: Banking and financial institution records will show what happened to the loan proceeds of the fraudulently obtained loans, where PATES received his income, how he has spent that income, and whether/which corporate bank accounts he has control over, all of which is relevant both to whether there was fraud against banks and/or the straw borrowers, as well any evasion of tax obligations;

e.    **Income and Expenses**: Any records related to PATES' income or the purchase of goods or services will be evidence of where PATES spent his undeclared income or proceeds of fraudulent schemes, and whether PATES evaded taxes by failing to declare all income as required for both his own personal tax returns and his businesses. These records will also be evidence of what the fruits of the crime are and where they are located;

f.    **Corporate Records:** Corporate records (whether related to for-profit or not-for-profit corporations) will be evidence of what businesses PATES controlled, what (if anything) the  businesses were actually doing, whether he had any employees;

g.    **Communications and Correspondence:**  Correspondence records, especially e-mail records, related to any of the above categories will reveal, among other things, who PATES was working with as co-conspirators (witting or unwitting), may identify additional victims and witnesses, as well as evidence PATES' knowledge of the truth or falsity of his claims to the various defrauded financial institutions.

B.    **Basis For Device To Be Searched**

46.    I have probable cause to believe that fruits, evidence and instrumentalities of conspiracy to defraud and to commit offenses, mail fraud, wire fraud, obstructing the IRS and tax evasion will be found on the **TARGET DEVICES** for the reasons set forth herein. Based on my training and experience, fraudsters like PATES who do not maintain a known physical business address necessarily keep records and electronic media (including laptops and smart phones) related to their activity at their residence or other location that they access frequently.

47.    On or about August 5, 2020, a federal search warrant (20mj3179) was executed at the residence of PATES in San Diego.  During the course of the execution of the warrant, agents seized numerous electronic storage devices.  These electronic storage devices included, but are not limited to, the following (the **TARGET DEVICES**), as identified on the evidence seizure forms:

a.    Apple iPad model A1416, inventoried as item 1 on 412-2020-

CE-465;

      b.    1-G hard disk drive inventoried as item 2 on 412-2020-CE-465;

      c.    Apple iPad model A1475, inventoried as item 3 on 412-2020-CE-465;

      d.    Apple iPad model A1416, inventoried as item 4 on 412-2020-CE-465;

      e.    WOR(L)D Space MCELL5G, inventoried as item 3 on 412-2020-CE-466;

      f.    Buffalo, Inc. hard disk drive, inventoried as item 2 on 412-2020-CE-467;

      g.    Buffalo, Inc. hard disk drive, inventoried as item 2 on 412-2020-CE-469;

      h.    Seagate Technology Inc., model LRDOTU3 hard disk drive, inventoried as item 1 on 412-2020-CE-471;

      i.    Seagate Technology Inc., model LRDOTU3 hard disk drive, inventoried as item 2 on 412-2020-CE-471;

      j.    Apple iPhone model A1662, inventoried as item 1 on 412-2020-CE-477;

      k.    Apple iPad model A2069, inventoried as item 2 on 412-2020-CE-482;

      l.    Apple iPhone 11 Pro Max, inventoried as item 4 on 412-2020-CE-482;

      m.    Apple MacBook Pro model A1707, inventoried as item 1 on 412-2020-CE-487; and

      n.    Apple iPad Pro model A1652, inventoried as item 1 on 412-2020-CE-495.

      48.    Following the seizure of the electronic storage devices identified above, agents attempted to image the devices and extract the data, but were unable to do so, due

to the form of encryption used on the devices. For example, several of the devices were identified as being encrypted with FileVault2 encryption.  No analysis of the extracted media could be accomplished without decrypting this data.  Decrypting data is a slow process that requires specific hardware and software to accomplish.  Even after beginning decryption there are no guarantees that decryption will successfully conclude in the available timeframe.  Additionally, several of the phones were either unable to have their content extracted or the extraction was limited to a minimal amount of data based on limitations of the forensics tools in relation to the model and operating system revision of the device.

49.    Based on my training and experience, my investigation in this case, and my communications with others involved in the forensic examination of electronic storage devices, I have learned that with the passage of time since the original warrant, forensic tools have been developed that will now likely permit the **Target Devices** to be imaged, and the data extracted therefrom. For example, GrayKey is one application commercially available for cell phone forensics produced by Grayshift.  GrayKey has undergone numerous updates since this case has begun.  Theses updates continue to improve the likelihood of acquiring an extraction on a locked cell phone as more exploits are developed for each version of operating systems.  Thus, a seized device that has not been updated since the time of its seizure is more susceptible to extraction from forensic software that has been updated numerous times as new access points are developed.

50.    Based on my training and experience, my investigation in this case, and my communications with other agents, I have probable cause to believe PATES retained the evidence described in Attachment B in electronic format based on the following:

a.    Multiple witnesses associated with PATES – including PATES' (estranged) wife Sandra Pates – described about how he uses computers, smart phones, tablets and secure (encrypted) email to conduct his business. Specifically, Sandra said that the only way recently she had been able to communicate with Pates was via "Telegram" which is a secure and encrypted messaging app.

*Affidavit in Support of Search Warrant*

b.       The same witnesses reported seeing PATES keep computers and other electronic media at his residence, which he uses to conduct his business.

c.       Tamayo stated that PATES used his home in the past to show Tamayo his "business model" on several computer screens. Tamayo stated that he remembered PATES also showing another individual by the name of Ruben (LNU)[18] this same business plan at PATES' home.

d.       Tamayo told investigators that PATES gave Tamayo one of PATES' old iPads to use for the business, which Tamayo provided to law enforcement and consented to have searched. A forensic analysis was done of the iPad, and agents found numerous text message communications between Tamayo and PATES, including messages in 2017 discussing matters such as: (1) PATES asking Tamayo to pick up mail for him at a rental mailbox; (2) Tamayo telling PATES about receiving calls from financial institutions; (3) PATES telling Tamayo not to speak to law enforcement.

e.       On November 21, 2019, IRS agents participated in an interview of Darlene Van Tash, another one of PATES' straw borrowers. Van Tash presented numerous documents and records she had kept from her interactions with PATES, including print outs of emails she exchanged with PATES using the Hushmail account

---

[18]     Based on the investigation, I have probable cause to believe that the Ruben that Tamayo referred to was Ruben Garcia, whose name appears on a mailbox associated with PATES and who appears to have been the straw borrower on at least four loans and one credit card as follows:

| Date | Financial Institution | Loan Amount |
|---|---|---|
| 6/29/15 | Pen Fed Credit Union | $15,000 |
| 6/29/15 | Navy Federal Credit Union | $45,000 |
| 7/9/15 | Pacific Marine Credit Union | $15,000 |
| 7/23/15 | Golden 1 Credit Union | $10,000 |
| **Date** | **Financial Institution** | **Line of Credit** |
| 1/28/17 | Navy Federal Credit Union | $25,000 |
| | Total | **$110,000** |

Garcia was interviewed by the Secret Service on October 12, 2017; he denied knowing PATES and declined to answer additional questions.

*Affidavit in Support of Search Warrant*

"noble.djeb@nym.hush.com."[19] Those emails included an email from PATES on March 31, 2014, regarding the activation of the credit cards she obtained for him.

## C.   Genuine Risks of Destruction

51.     Based upon my experience and training, and the experience and training of other Agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills.  This is not a concern here, since the **TARGET DEVICES** have remained in the custody of law enforcement since the execution of the original search warrant in 2020. The original warrant allowed law enforcement to retain the target device for a period of 45 days to image it, and then return it to its owner.  No data was able to be extracted from the **TARGET DEVICES** that were not iPhones and analyzed within the time (120 days) permitted under the original warrant, nor under two additional extensions that were obtained.  Limited data extractions referred to as a Before First Unlock (BFU) were obtained on several of the iPhone devices.  These extractions have a limited amount of data that can be parsed by the forensic platform.  Most frequently, a BFU extraction only contains operating system data and little or no user data.   With the advancement of forensic tools, more advanced extractions are now likely to be available making user data available for forensic review. Thereafter, return of the **TARGET DEVICES** was offered to Mr. Pates, but Pates never retrieved the **TARGET DEVICES**. They remain in the custody of law enforcement at this time.

## E.   Previous Attempts to Obtain This Evidence

52.     There have been no previous attempts to obtain this evidence, other than as described herein.

## IV.   PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

53.     With the approval of the Court in signing this warrant, agents executing this

---

[19]     According to Hushmail's website, Hushmail "protects email using encryption" and is accessible by "desktop webmail and native iPhone app, plus support for desktop and smartphone email applications." Hushmail represents that its "powerful encryption" can "keep your most personal conversations private and confidential."

search warrant will employ the following procedures regarding computers and other electronic storage devices, including electronic storage media, that may contain data subject to seizure pursuant to this warrant:

### Forensic Imaging

a.     A forensic image is an exact physical copy of the hard drive or other media.  A forensic image captures all the data on the hard drive or other media without the data being viewed and without changing the data.  Absent unusual circumstances, it is essential that a forensic image be obtained prior to conducting any search of the data for information subject to seizure pursuant to this warrant.

### Identification and Extraction of Relevant Data from Computers and Tablets

b.     After obtaining a forensic image, the data will be analyzed to identify and extract data subject to seizure pursuant to this warrant.  Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment and software. There are thousands of different hardware items and software programs, and different versions of the same programs, that can be commercially purchased, installed, and custom-configured on a user's computer system.  Computers are easily customized by their users.  Even apparently identical computers in an office or home environment can be different with respect to configuration, including permissions and access rights, passwords, data storage, and security.  It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

c.     Analyzing the contents of a computer or other electronic storage device, even without significant technical challenges, can be very challenging.  Searching by keywords, for example, often yields many thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant.  Merely finding a relevant hit does not end the review process for several reasons.  The computer may have stored metadata and other information about a relevant electronic record – e.g., who created it, when and how it was created or downloaded or

*Affidavit in Support of Search Warrant*

copied, when it was last accessed, when it was last modified, when it was last printed, and when it was deleted.   Keyword searches may also fail to discover relevant electronic records, depending on how the records were created, stored, or used.   For example, keywords search text, but many common electronic mail, database, and spreadsheet applications do not store data as searchable text.   Instead, the data is saved in a proprietary non-text format.   Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs because the printed document is stored as a graphic image.   Graphic images, unlike text, are not subject to keyword searches. Similarly, faxes sent to the computer are stored as graphic images and not as text.   In addition, a particular relevant piece of data does not exist in a vacuum.   To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data.   Information about which user had logged in, whether users share passwords, whether the computer was connected to other computers or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting at the keyboard.

d.     It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded, or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users that generally is not visible to users.   Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies and application and operating system metadata, often provides evidence of who was using the computer at a relevant time. In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars and address books stored on the computer may identify the user at a particular, relevant time.   The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents,

may serve to identify a particular user.  For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

e.    Analyzing data has become increasingly time-consuming as the volume of data stored on a typical computer system and available storage devices has become mind-boggling.  For example, a single megabyte of storage space is roughly equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is roughly equivalent of 500,000 double-spaced pages of text.  Computer hard drives are now being sold for personal computers capable of storing up to 2 terabytes (2,000 gigabytes) of data.  This data may be stored in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer).  The sheer volume of data also has extended the time that it takes to analyze data.  Running keyword searches takes longer and results in more hits that must be individually examined for relevance.   And, once reviewed, relevant data leads to new keywords and new avenues for identifying data subject to seizure pursuant to the warrant.

f.    Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including hashing tools to identify data subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as known operating system and application files.  The identification and extraction process, accordingly, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within one-hundred twenty (120) days of this warrant, absent further application to this court.

g.    All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

//

*Affidavit in Support of Search Warrant*

**<u>Identification and Extraction of Relevant Data from Cellular Phones</u>**

h. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subjet to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

i. Following the issuance of this warrant, I will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

j. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the

*Affidavit in Support of Search Warrant*

identification and extraction of data will complete the analysis within one hundred twenty (120) days of the date the warrant is signed, absent further application to this court.

## VI.   CONCLUSION

54.    Based on the foregoing, there is probable cause to believe that the items identified in Attachment B constitute evidence of Conspiracy to Defraud and to Commit Offenses (18 U.S.C. § 371), Mail Fraud (18 U.S.C. § 1341), Wire Fraud (18 U.S.C. §1343), Bank Fraud (18 U.S.C. §1344), Failure to File Tax Return (26 U.S.C. §7206(1)), and Aiding or Assisting in the Preparation of False Returns (26 U.S.C. §7206(2)), for the period from January 1, 2014, up to and including August 5, 2020, and will be found on the **TARGET DEVICES** described in Attachment A.

_Erik La Com_
_____
ERIK LA COM, SPECIAL AGENT
U.S. Secret Service

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1 in this 16th day of December, 2022.

_____
HONORABLE  BERNARD G. SKOMAL
UNITED STATES MAGISTRATE JUDGE

*Affidavit in Support of Search Warrant*